[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-15891

_____

D. C. Docket No. 02-00143-CR-N

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 22, 2003
THOMAS K. KAHN
CLERK**

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

JESSIE JEROME PERKINS, JR.,
JOHNNY LEWIS SCOTT,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(October 22, 2003)**

Before DUBINA, BARKETT and HILL, Circuit Judges.

BARKETT, Circuit Judge:

The United States appeals from the trial court's order granting the motions of Jesse Jerome Perkins Jr. and Johnny Lewis Scott to suppress all statements made and physical evidence obtained during a traffic stop for the issuance of a traffic warning citation. Following an evidentiary hearing, the Magistrate Judge recommended that the motions be granted. The district court accepted the Magistrate Judge's recommendation, and we affirm these decisions.

## I. BACKGROUND

The essential facts of this case are not in dispute and are fully stated in the Magistrate Judge's recommendation. Officer Colston of the Alabama Highway Patrol was patrolling the interstate when he observed a maroon Plymouth automobile with a Florida license plate cross the white fault line and veer onto the shoulder of the highway. Fearing that the driver was falling asleep or under the influence of drugs or alcohol, Colston initiated a traffic stop and approached the passenger side of the vehicle where Scott was seated, explaining to both defendants that he stopped them to ensure that Perkins, who was driving, was not asleep or under the influence of drugs or alcohol. After inspecting Perkins' driver's license and insurance information, Colston asked Perkins to get out of the car so he could give Perkins a warning ticket for a lane violation, assuring him that, after the

2

issuance of the warning citation, he would be free to leave. Scott remained in the vehicle.

After briefly searching Perkins for weapons, Colston then directed him to sit in the patrol car while he completed the warning ticket. Noticing the Tampa address on Perkins' Florida driver's license, Colston asked Perkins if Tampa was his ultimate destination. Perkins' negative response prompted Colston to ask him a series of questions about his residency, employment, and destination. Perkins explained that he had once lived in Tampa but had since relocated to Montgomery, Alabama, where he was employed at Rhodes Furniture. In response to Colston's questions about his destination, Perkins indicated that he was headed to Greenville, Alabama. According to Colston, Perkins was extremely nervous, breathed rapidly, and repeated Colston's questions before answering them. Perkins was not free to leave during this questioning.

Colsten then radioed the dispatch officer to conduct a driver's license check. While waiting for the response, Colston asked Perkins if Scott lived in Tampa or Montgomery. Colston also asked Perkins more detailed questions about how long he had lived in Montgomery, when he was going to get an Alabama driver's license, and whom he was going to visit in Greenville. Perkins told Colston that he was going to visit his cousin, Shantay. After the driver's license check revealed

that Perkins' license was valid and that he had no outstanding criminal warrants, Colston gave the completed warning ticket to Perkins for his signature. Colston testified that, after completing the warning citation, he was finished with that portion of his investigation relating to the traffic stop. However, Colston continued to detain Perkins because of his nervousness; what he perceived as Perkins' evasive behavior in response to his questions; and his hunch that Perkins was being untruthful about his destination. Colston subsequently decided to question Scott about his destination.

Colston asked Scott to identify himself and questioned him about his destination. Scott explained that he and Perkins were going to Greenville. When Colston asked whom he would be visiting in Greenville, Scott told him he would be visiting a girl named Quinn. Colston also asked Scott if the car contained any contraband or other illegal substances. Scott disavowed any knowledge of any narcotics or other contraband. Colston testified that Scott was not free to leave during this questioning.

Without further inquiry, Colston returned to his patrol car, retrieved the signed warning citation from Perkins, and asked whether the vehicle contained any contraband or other illegal substances. When Perkins said no, Colston asked for Perkins' permission to search the vehicle. Perkins refused to consent, and Colston

4

then called the dispatch officer and requested a drug-sniffing dog. When the canine unit arrived, Colston removed Scott from the vehicle, conducted a brief pat-down search for weapons, and placed him in the backseat of the patrol car. Colston left the defendants in the car while he conferred with the canine unit officer. Unaware that their conversation was being taped, Scott disavowed any knowledge of the existence of narcotics, and both defendants debated about whether the dog would be able to find drugs. After concluding his conversation with the canine unit officer, Colston joined Perkins and Scott in the patrol car and again asked if any narcotics, contraband, or other weapons were in the vehicle. When Perkins said no, Colston rephrased the question, asking Perkins if he had any narcotics for personal use. Again, Perkins denied the presence of narcotics. Undaunted, Colston asked Perkins to tell him the exact amount of narcotics that he had hidden in the car. Perkins finally acquiesced, admitted that narcotics were in the car, and offered to show Colston where they were hidden. Perkins was escorted to the vehicle where he informed Colston that the drugs were in the center console, where Colston then found them.

## II.  STANDARD OF REVIEW

The grant or denial of a motion to suppress evidence is reviewed in this Court as a mixed question of law and fact.  United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002).  We assess the district court's findings of fact under the clearly erroneous standard and review the application of the law to the facts de novo.  Id.  The facts are construed in favor of the party that prevailed below which in this case is Perkins and Scott.  United States v. Wilson, 894 F.2d 1245, 1254 (11th Cir. 1990).

## III.  DISCUSSION

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  A seizure takes place "whenever a police officer accosts an individual and restrains his freedom to walk away."  United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).  Traffic stops qualify as seizures under the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979).

The Supreme Court has identified at least three separate categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply: (1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny, Florida v. Bostick, 501 U.S. 429 (1991);

6

(2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, Terry v. Ohio, 392 U.S. 1 (1968); and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, Brown v. Illinois, 422 U.S. 590 (1975).

As the Magistrate Judge recognized:

> At issue in this case is the second type of encounter, commonly referred to as a Terry stop. United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). . . . Terry requires that an officer have an objective, reasonable suspicion of criminal activity. Pursuant to this standard, a traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place," Purcell, 236 F.3d at 1277 (citing Terry, 392 U.S. at 20) . . . , and may not last "any longer than necessary to process the traffic violation" unless there is articulable suspicion of other illegal activity. Id. (citing United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997)).

Rec. of Magis. Judge, (Oct. 3, 2002) at 9.

Under the exclusionary rule, evidence obtained in an encounter that is in violation of the Fourth Amendment, including the direct products of police misconduct and evidence derived from the illegal conduct, or "fruit of the poisonous tree," cannot be used in a criminal trial against the victim of the illegal search and seizure. United States v. Terzado-Madruga, 897 F.2d 1099, 1112 (11th Cir. 1990). See also Weeks v. United States, 232 U.S. 383, 391-93 (1914).

7

Perkins and Scott initially argue that the duration of their traffic stop itself was unconstitutional under Terry. Even construing the facts in favor of Perkins and Scott, we agree with the Magistrate Judge that in this case the duration of the traffic stop was not unreasonable. See Purcell, 236 F.3d 1274, 1278 (finding that a traffic stop totaling fourteen minutes is not unreasonable on its face); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988) (holding that an investigative stop of 50-minute duration is not unreasonable). Cf. United States v. Place, 462 U.S. 696, 709, 710 (1983) (holding that a 90-minute stop is probably too long for a Terry stop); United States v. Codd, 956 F.2d 1109, 1111 (11th Cir. 1992) (finding that a two-and-a-half hour investigative detention is too long for a Terry stop).

However, we conclude that the circumstances here do not give rise to the requisite reasonable suspicion justifying continued detention of Perkins and Scott after the warning ticket had been issued. A traffic stop may be prolonged where an officer is able to articulate a reasonable suspicion of other illegal activity beyond the traffic offense. Purcell, 236 F.3d at 1277. "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). When making a

8

determination of "reasonable suspicion," we must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). It is clear that "an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity" is not enough to satisfy the minimum level of objectivity required. Wardlow, 528 U.S. at 124 (quoting Terry, 392 U.S. at 27).

The Government argues that the totality of the following circumstances gave rise to a reasonable suspicion of drug trafficking: (1) Perkins' nervousness; (2) the "odd behavior" of Perkins in repeating the questions Colston asked him; (3) Perkins' possession of a Florida driver's license while claiming to live in Montgomery, Alabama; and (4) the "inconsistent" statements from Perkins and Scott with regard to whom they were going to see in Greenville, Alabama.[1]

---

[1]Perkins and Scott argue that the Magistrate Judge correctly determined that:

> The government cannot rely on an inconsistent statement acquired after an officer has already begun investigating matters unrelated to the traffic stop as evidence of a reasonable suspicion of criminal activity. . . . Colston's testimony establishes that any investigation related to the lane violation ended when he completed the warning citation and gave it to Perkins for his signature.

Rec. of Magis. Judge at 11.

9

We find that these circumstances, separately or cumulatively, cannot support a legitimate inference of further illegal activity that rises to the level of objective, reasonable suspicion required under the Fourth Amendment.

First, the Supreme Court has noted that a traffic stop is an "unsettling show of authority" that may "create substantial anxiety." Delaware, 440 U.S. at 657. There is no reason why Colston should have reasonably suspected that Perkins' nervousness was tied to anything other than the fact that he was being momentarily detained by an authority figure with police power over him. On cross examination, Colston admitted that a nervous driver is not in itself suspicious. Rec. of Magis. Judge at 15 n.49. Furthermore, repeating the questions of a police officer hardly constitutes "odd behavior"; it is easily a common symptom of "substantial anxiety" that many habitually lapse into when experiencing fear. Indeed, it is a common occurrence at oral arguments before this Court by even the most seasoned lawyers. Likewise, one cannot reasonably assume that a nervous person claiming to be an in-state resident while in possession of an out-of-state license is lying about where he or she is from and is thus a drug trafficker. There are many reasons one may have failed to change the license including lack of time because of a recent move,

---

We need not address this argument because we find that even with this "fact," reasonable suspicion does not exist here.

10

cost, inconvenience, carelessness, or simple laziness. Finally, the answers given by Perkins and Scott as to whom they were going to see in Greenville, Alabama, do not support reasonable suspicion. Perkins told the officer that he was going to visit his cousin Shantay in Greenville. Scott told Colston that he was going to Greenville to visit a girl named Quinn. Scott's answer did not contradict Perkins' answer in any way. Perkins and Scott could have intended to see both persons during their visit, or Perkins could have intended to visit Shantay while Scott visited Quinn.

In this Circuit, we have required more than the innocuous characteristics of nervousness, a habit of repeating questions, and an out-of-state license for giving rise to reasonable suspicion. See United States v. Pruitt, 174 F.3d 1215, 1221 (11th Cir. 1999) (holding that the fact that the driver was Hispanic and had an out-of-state license plate was not enough to detain him beyond the issuance of the speeding ticket); United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir. 1990) ("[B]eing Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates (not yet a crime in Alabama) . . . fail to suggest that appellant . . . [was] engaged in any criminal activity other than speeding on the highway.").

11

As Colston testified, following issuance of the traffic citation to Perkins, he merely had a "hunch" based upon the totality of the circumstances that Perkins was lying to him about his destination. This "hunch" led him to initiate a new investigation of other criminal activity after the purpose of the traffic stop had ended. Thus, the continued detention of Perkins and Scott beyond the issuance of the traffic citation, during which Colston repeatedly asked if there were drugs in the car and called in a drug dog, was unlawful. Since Perkins' consent to the search of the car was the product of an unlawful detention, "the consent was tainted by the illegality and was ineffective to justify the search." Florida v. Royer, 460 U.S. 491, 507-08 (1983) (plurality opinion). Therefore, any statements made and evidence seized during the unlawful detention are to be excluded. Finally, we emphasize that "the fact that [Colston's] hunch ultimately turned out to be correct–i.e. that [Perkins and Scott] were illegally transporting [drugs] is irrelevant for purposes of the Fourth Amendment. To hold otherwise would open the door to patently illegal searches by government officials, who would attempt to justify the legality of their conduct after-the-fact." Pruitt, 174 F.3d at 1221 n.4.

## IV. CONCLUSION

Based on the foregoing, we conclude that Colston's prolonged detention of Perkins and Scott beyond the issuance of the traffic citation was unconstitutional. Colston's inference from the totality of the circumstances that he observed was merely an unparticularized hunch that failed to rise to the level of reasonable suspicion of other criminal activity. We thus **AFFIRM** the district court's grant of Perkins and Scott's motions to suppress.