892 So.2d 448 (2004)
STATE of Alabama
v.
Curtis McPHERSON.
CR-03-0289.
Court of Criminal Appeals of Alabama.
May 28, 2004.
*449 Troy King and William H. Pryor, Jr., attys. gen., and J. Thomas Leverette, asst. atty. gen., for appellant.
C. Brandon Sellers III, Greenville, for appellee.
BASCHAB, Judge.
The State appeals from the trial court's order suppressing evidence a law enforcement officer seized from the vehicle and person of the appellee, Curtis McPherson, during a traffic stop. The appellee filed a pretrial motion to suppress in which he argued that the law enforcement officer detained him for an unreasonable period of time during a traffic stop; that the officer did not have reasonable suspicion to detain him while waiting on a K-9 unit to respond; and that any evidence the officer seized pursuant to the illegal detention should be suppressed. After conducting a hearing, the trial court granted the appellee's suppression motion. This appeal followed.
Trooper Jesse Peoples testified that he had been with the Alabama Department of Public Safety since 1989 and was involved in highway patrol and criminal interdiction; that, shortly after 10:00 a.m. on September 11, 2002, the appellee drove up behind him on I-65 with the headlights on his vehicle on bright; that the appellee changed from the right lane to the left lane without giving a signal; that the appellee passed him and changed from the left lane to the right lane without giving a signal; that he stopped the appellee for making an improper lane change; that he approached the appellee's vehicle, asked the appellee for his driver's license, and told the appellee why he had stopped him; that the appellee gave him his driver's license and told him that he was not thinking; that he asked the appellee to step back to his patrol vehicle; that, as they were sitting in his vehicle and talking, the appellee would not make eye contact with him and kept staring out the front window; that he could see the appellee's carotid pulse, which was exaggerated; that the appellee's voice was cracking and quivering; that, while he was talking to the appellee, he was checking the appellee's driver's license; that the appellee did not have proper insurance; that, at some point, he told the appellee he would write him a warning ticket; that the appellee's level of nervousness did not decrease when he told him he was only getting a warning ticket; that most people become less nervous at that point; that he asked the appellee if he had a gun, and the appellee told him he had one; that he asked the appellee if he had a gun permit, and the appellee gave him a facially valid permit; that he subsequently retrieved the gun from the appellee's vehicle and called it in to find out if it was stolen; that, even after he had retrieved the gun, the appellee's level of nervousness did not decrease; that he asked the appellee if there was anything else in the vehicle; that he asked the appellee if he would mind if he searched the vehicle, and the appellee said, "`I would rather you not'"; that he asked the appellee again, and the appellee said, "`[M]an, you don't understand'"; that, when the appellee said that, his voice was quivering and he was almost to the point of tears; that the appellee did not tell him what he did not understand; that, in fourteen years, he had dealt with thousands of people, and the appellee's level of nervousness was more elevated than that of a normal motorist; that he would not have felt safe returning the gun to the appellee and wanted to alleviate his fears and concerns *450 before he returned the gun to the appellee; that he then called Chris Brown, a K-9 unit who was in the area, for back-up; and that, during a subsequent search, he found drugs in the glove compartment of the vehicle. (R. 14, 25-26.) Peoples also testified that, at the time he called Brown, he had all of the information he needed to write the warning ticket; that the entire stop lasted between twenty-eight and twenty-nine minutes; that that was normal for the type of stop involved in this case; that he did not let the appellee sign the warning until they went to the Alabama Bureau of Investigation office; and that the appellee was not free to leave because the traffic stop was not completed until after he had been arrested.
Trooper Chris Brown, a K-9 officer with the Alabama Department of Public Safety, testified that, on September 11, 2002, he responded to Peoples' call for back-up; that Peoples told him he needed to use his dog; that he walked his dog around the appellee's vehicle; that the dog alerted on the right rear and left rear doors of the vehicle; that he advised Peoples about the positive response on the vehicle; and that he saw Peoples search the vehicle.
A videotape of the traffic stop was admitted into evidence during the hearing on the appellee's motion to suppress, and we have reviewed it. The appellee was not visible during the majority of the videotape; in fact, the only time the videotape shows the appellee before Brown arrived was when the appellee walked from his vehicle to the patrol vehicle. Also, during much of the videotape, the appellee's voice is barely audible. However, the videotape shows that Peoples initiated the traffic stop at 10:03 a.m.; that, after the appellee stopped, Peoples approached his vehicle, asked him for his driver's license, and asked him to come back to his patrol vehicle; that, at 10:05 a.m., Peoples told the appellee he was going to write him a warning; that Peoples subsequently contacted the dispatcher and gave her the appellee's driver's license and license tag numbers; that, after Peoples received some initial information from the dispatcher, he asked the dispatcher to run some type of a check; that, while waiting for the results of that check, Peoples chatted with the appellee about various subjects; that, at 10:11 a.m., the dispatcher contacted Peoples with more information; that Peoples then commented on the appellee's nervousness and asked the appellee if he had any weapons; that the appellee said he had a gun, and Peoples got the gun out of the appellee's vehicle; that Peoples then asked the appellee if he had anything else in the vehicle, and the appellee said that he did not; that Peoples asked the appellee if he minded if he looked in the vehicle, and the appellee said that there was not anything else in the vehicle; that, at that point, Peoples asked the dispatcher to check the serial number on the gun to find out if it was stolen; that, while waiting for that information, Peoples again asked the appellee if he had a problem with him searching his vehicle, and, after the appellee responded, he commented on the appellee's nervousness; that the appellee, in a highly agitated voice, said that Peoples did not understand; that, at 10:16 a.m., Peoples contacted Brown; that the dispatcher subsequently contacted Peoples, and Peoples again gave her the gun's serial number; that, at 10:17 a.m., the dispatcher told him that the gun was not on file; that, at that point, Peoples asked for the appellee's social security number and height and then asked the appellee to give him his driver's license again; that Peoples told the appellee he needed to get the vehicle identification number for the vehicle; that, at 10:19 a.m., he asked the appellee for his insurance card and discovered that it was expired; that, at 10:22 a.m., *451 Brown arrived and conducted a walk around of the vehicle with his dog; that, at 10:24 a.m., Brown completed the walk around of the vehicle and told Peoples and the appellee that the dog had given a positive response; and that Peoples then searched the appellee's vehicle.
The State argues that the trial court erroneously granted the appellee's motion to suppress. Specifically, it contends that Peoples lawfully detained the appellee while waiting for Brown to respond because Peoples had reasonable suspicion that criminal activity was afoot. Because the facts in this case are not in dispute, we apply a de novo standard of review. See State v. Otwell, 733 So.2d 950 (Ala.Crim.App.1999).
"With certain limited exceptions enumerated in subsection (b), and not here applicable, Ala.Code 1975, § 32-1-4 prohibits traditional custodial arrests for misdemeanor traffic offenses where the offender is willing to sign the UTTC. See Sheffield v. State, 522 So.2d 4, 7 (Ala.Cr.App.1987); Hays v. City of Jacksonville, 518 So.2d 892, 893 (Ala.Cr.App.1987). However, § 32-1-4(a) does permit `limited detention or custody' of traffic offenders and, consequently, an officer may `requir[e] a motorist to sit in a patrol car while the officer completes the [UTTC].' Pittman v. State, 541 So.2d 583, 585 (Ala.Cr.App.1989) (citing United States v. Parr, 843 F.2d 1228, 1229-31 (9th Cir.1988). The limited detention permitted by § 32-1-4(a) does not give rise to a search incident to arrest of either the motorist's person, State v. Davis, 477 So.2d 504, 506 n. 1 (Ala.Cr.App.1985); Thomas v. State, 453 So.2d 1075, 1077 (Ala.Cr.App.1984), or the motorist's vehicle, see Morton v. State, 452 So.2d 1361, 1364 (Ala.Cr.App.1984), overruled on other grounds, Cannon v. State, 601 So.2d 1112 (Ala.Cr.App.1992). While the officer may conduct a limited protective search for weapons of the motorist's person, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and car, Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), he `must have an actual suspicion that weapons are present' in order to do so, United States v. Lott, 870 F.2d 778, 784 (1st Cir.1989) (emphasis added). See generally 3 W. LaFave, Search and Seizure, §§ 9.4(a), (e) (2d ed.1987).
"Once the traffic offender signs the UTTC, the arresting officer is to `forthwith release him from custody.' § 32-1-4(a). The officer may further detain the driver only if he has probable cause to arrest the driver for some other non-traffic offense, see Hawkins v. State, 585 So.2d 154 (Ala.1991), or has a reasonable suspicion of the driver's involvement in some other criminal activity justifying further detention for investigatory purposes under Terry v. Ohio, see United States v. Tapia, 912 F.2d 1367 (11th Cir.1990).
"`Reasonable suspicion is a less demanding standard than probable cause.' Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). However, reasonable suspicion exists only if the officer has `specific, particularized, and articulable reasons indicating that the person [stopped] may be involved in criminal activity,' Hickman v. State, 548 So.2d 1077, 1080 (Ala.Cr.App.1989). `To determine whether reasonable suspicion existed for a particular stop, the totality of the circumstances, as known to the officer at the inception of the stop, [or, in this case, at the time of the continued detention,] must be considered.' Arnold v. State, 601 So.2d 145, 149 (Ala.Cr.App.1992) (emphasis added). Accord Lamar v. State, 578 So.2d 1382, 1385 (Ala.Cr.App.), *452 cert. denied, 596 So.2d 659 (1991)."
State v. Washington, 623 So.2d 392, 395-96 (Ala.Crim.App.1993).
"It is well established that
"`a police officer may make a brief investigatory detention based upon a "reasonable suspicion" of criminal activity. This court in State v. Bodereck, 549 So.2d 542, 545-46 (Ala.Cr.App.1989), quoting from United States v. Post, 607 F.2d 847, 850 (9th Cir.1979), discussed "reasonable suspicion" as mentioned in Terry [v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] and stated:
"`"`[T]he quantum of cause necessary to justify an investigatory stop is a "reasonable" or "founded" suspicion that the person has committed or is about to commit a criminal act.... The founded suspicion must arise from specific facts and not inchoate hunches, but the officer is entitled to draw inferences from those facts in light of his experience.'"'
"Gaskin v. State, 565 So.2d 675, 677 (Ala.Cr.App.1990) (emphasis added). When evaluating whether reasonable suspicion for a stop exists, we require that the police officer be able to
"`"point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. Terry v. Ohio. ... The appropriate question to ask is '... [W]ould the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?'. Terry v. Ohio, ... Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973)."
"`Sterling v. State, 421 So.2d 1375, 1379 (Ala.Cr.App.1982).'
"Gaskin, 565 So.2d at 677.
"....
"... [T]he law does not require that the appellant be engaged in illegal activity before an officer may make an investigative stop.
"`"`[T]he relevant inquiry in evaluating the presence of reasonable suspicion is "`not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts.'"' "State v. Washington, 623 So.2d at 397 (quoting United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir.1990)) (quoting United States v. Sokolow, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989), and Illinois v. Gates, 462 U.S. 213, 243-44 n. 13, 103 S.Ct. 2317, 2334-35 n. 13, 76 L.Ed.2d 527 (1983)).'
"Hopkins v. State, 661 So.2d 774, 782 (Ala.Cr.App.1994). When reviewing the degree of suspicion that attaches to noncriminal behavior, courts should give great deference to the training and experience of police officers. This court has noted that' "[w]hile many factors which can contribute to a reasonable suspicion of criminal activity are subject to a variety of interpretations, it is the experience of an officer that allows him to bring the factors together into a meaningful whole demonstrating reasonable suspicion of criminal activity."' Id. at 779 (quoting 2 W. Ringel, Searches and Seizures, Arrests and Confessions § 13.4(a) (2d ed.1994))."
Williams v. State, 716 So.2d 753, 755-56 (Ala.Crim.App.1998).
In this case, the appellee had not signed the warning ticket at the time Peoples called for Brown to respond to the area. Also, the State presented evidence *453 that the appellee was extremely nervous while Peoples was talking to him, his voice was cracking, his carotid pulse was visible, and he would not make eye contact with Peoples; that the appellee did not become less nervous after Peoples told him he was going to give him a warning; that the appellee had had a gun in his vehicle; that, when Peoples asked for consent to search his vehicle, the appellee was nearly in tears and told Peoples," `[M]an, you don't understand'"; that the appellee did not tell Peoples what he was talking about; and that Peoples had safety concerns about returning the weapon to the appellee. (R. 25-26.) Further, Peoples testified that the entire stop lasted only twenty-eight or twenty-nine minutes and that that length of time was normal for the type of stop involved in this case. The videotape of the traffic stop shows that nineteen minutes elapsed between the time Peoples told the appellee he was going to write him a warning and the time Brown and the dog completed their walk around of the appellant's vehicle; that, when Peoples contacted Brown, he was still waiting for information about the appellee's gun; and that, during the time they were waiting for Brown to arrive, Peoples received the information about the appellee's gun and started getting basic information from the appellee and obtained the appellee's insurance card, which was expired. The videotape also shows that, when Peoples initially asked the appellee for permission to search his vehicle, the appellee did not answer his question and that, after Peoples again requested permission to search the vehicle and commented on his nervousness, the appellee said, in a highly agitated voice, that Peoples did not understand. Finally, although the trial court stated during the suppression hearing that it had reviewed the videotape and that the appellee did not appear to be that nervous, we note that the appellee was not visible during most of the videotape and that his voice was barely audible during much of the videotape. Based on our review of the testimony and the videotape, we conclude that Peoples did not detain the appellee for an unreasonable amount of time during the traffic stop. Also, Peoples had reasonable suspicion to believe that criminal activity was afoot when he called for the K-9 unit. Therefore, he properly detained the appellee during the time he was waiting for Brown and while Brown walked the drug dog around the vehicle. Consequently, the trial court erroneously granted the appellee's motion to suppress the evidence law enforcement officers seized from his vehicle and his person. Accordingly, we reverse the trial court's judgment and remand this case to that court for proceedings that are consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, P.J., and SHAW, J., concur; COBB, J., dissents, with opinion, which WISE, J., joins.
COBB, Judge, dissenting.
I respectfully dissent from the majority's opinion reversing the trial court's order suppressing the controlled substances seized from Curtis McPherson's vehicle during a traffic stop. The principal reason given by Officer Peoples for detaining McPherson was that McPherson acted exceedingly nervous. The prosecution added that McPherson was also in lawful possession of a pistol and that his automobile insurance had expired. However, Officer Peoples testified that he had obtained all the information he needed to issue the warning ticket but because McPherson was nervous, he decided to search McPherson's automobile for drugs. That Officer Peoples did not submit the warning ticket to McPherson for him to sign until *454 after Officer Peoples had summoned a K-9 to search for drugs was obviously an intentional action meant to circumvent the release requirement of § 32-1-4(a), Ala.Code 1975.
"Once the traffic offender signs the UTTC [Uniform Traffic Ticket and Complaint], the arresting officer is to `forthwith release him from custody.' § 32-1-4(a). The officer may further detain the driver only if he has probable cause to arrest the driver for some other non-traffic offense, see Hawkins v. State, 585 So.2d 154 (Ala.1991), or has a reasonable suspicion of the driver's involvement in some other criminal activity justifying further detention for investigatory purposes under Terry v. Ohio, [392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] see United States v. Tapia, 912 F.2d 1367 (11th Cir.1990)."
State v. Washington, 623 So.2d 392, 395 (Ala.Crim.App.1993). The question is whether Officer Peoples had an objective basis at the time of the stop or developed one during the stop to believe that McPherson was in possession of drugs.
"`"To determine whether reasonable suspicion existed for a particular stop, the totality of the circumstances, as known to the officer at the inception of the stop, [or, in this case, at the time of the continued detention,] must be considered." Arnold v. State, 601 So.2d 145, 149 (Ala.Cr.App.1992) (emphasis added by Washington court). Accord Lamar v. State, 578 So.2d 1382, 1385 (Ala.Cr.App.), cert. denied, 596 So.2d 659 (1991).'"
Owen v. State, 726 So.2d 745, 747-48 (Ala.Crim.App.1998)(quoting State v. Washington, 623 So.2d at 395).
"When making a determination of `reasonable suspicion,' we must `look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.' United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). It is clear that `an "inchoate and unparticularized suspicion" or "hunch" of criminal activity' is not enough to satisfy the minimum level of objectivity required. [Illinois v.] Wardlow, 528 U.S. [119] at 124, 120 S.Ct. 673[, 145 L.Ed.2d 570 (2000)] (quoting Terry [v. Ohio], 392 U.S. [1] at 27, 88 S.Ct. 1868[, 20 L.Ed.2d 889] [(1961)])."
United States v. Perkins, 348 F.3d 965, 970 (11th Cir.2003).
"[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (emphasis added). "We have previously held that evasive words and behavior can form the basis for reasonable suspicion to conduct a search. Childress v. State, 455 So.2d 175, 177 (Ala.Cr.App.1984); Key v. State, 566 So.2d 251, 253 (Ala.Cr.App.1990)." Owen v. State, 726 So.2d at 747-48. However, it is well established that a defendant's nervousness or agitation alone is not a reasonable, articulable suspicion of criminal activity to justify continued detention after a traffic stop.
In State v. Washington, supra, Washington was stopped at approximately 2:30 a.m. on an interstate for speeding by Alabama State Trooper William Eller. Washington was taken to Officer Eller's patrol car. A video camera mounted in the patrol car recorded a large portion of the conversation between Officer Eller and Washington. Washington's only form of identification was a temporary Louisiana driver's license, which did not have a photo. However, Washington told Officer Eller that he *455 had a work identification card with a photograph in his car but for safety reasons, Officer Eller would not let Washington return to his car to retrieve it. Officer Eller gave the following reasons for detaining Washington after the Uniform Traffic Ticket and Complaint ("the UTTC") was signed: Washington had a temporary driver's license; Washington's license plate was temporary; Washington was driving a car rented by a third person, and the rental agreement did not list Washington as a driver; and Washington appeared to be very nervous. As soon as Washington signed the UTTC, Officer Eller stated to Washington that there was a problem with people hauling drugs up and down the interstate and asked if he could search Washington's car. Officer Eller then began questioning Washington about his prior arrest record and wanted to know if Washington had ever been in jail on a drug charge. Washington said that he had a past arrest for possession of cocaine and Officer Eller requested the dispatch operator to run an "EPIC" check on Washington. Further conversation ensued concerning the search of Washington's car. Officer Eller told Washington that he could be detained if he refused to give Officer Eller his consent to search the car. Washington refused and Officer Eller radioed for a canine unit to come to the scene. While waiting on the canine unit, the Officer Eller learned from dispatch that Washington had two prior drug convictions. The drug-sniffing dog arrived and alerted at the driver's door of Washington's car. After a search, .2 grams of cocaine and two "wads" of cash were found in the car. At approximately 3:51 a.m., Washington was arrested for possession of cocaine.
Washington moved to suppress the cocaine; the trial court granted the motion. On appeal, this Court affirmed the trial court's order, finding that the officer "did not have sufficient `specific, particularized, and articulable' reasons to suspect that the defendant was engaged in any criminal activity other than speeding." 623 So.2d at 397. This Court found that the facts that Washington had a temporary driver's license, that the license plate on the car was temporary, that the car was rented by a third person and the rental agreement did not list Washington as a driver,[1] and that Officer Eller stated that Washington was nervous did not create reasonable suspicion that Washington was carrying illegal drugs. In particular, the Washington Court noted the following concerning Officer Eller's allegation that Washington was nervous.
"As previously noted, the video tape visually depicts only the defendant's car and the activity there, so that we cannot see the defendant during his detention in [Officer] Eller's vehicle. We do note, however, that, until [Officer] Eller asked for permission to search the car, the defendant answered all questions without hesitation and even expansively. There is nothing in the tone of his voice or his manner of speaking to indicate that he was `extremely nervous.'"
State v. Washington, 623 So.2d at 398.
In Washington, this Court concluded: "None of the four factors relied on by the State are inherently suspicious and none of those factors would, standing alone, establish the reasonable suspicion necessary to justify Trooper Eller's continued detention of the defendant after the defendant signed the UTTC." State v. Washington, 623 So.2d at 399.
*456 I believe that the rationale from Washington is applicable to the facts presented in the instant case. Thus, I believe that Washington should be followed as precedent for affirming the trial court's order in the instant case that McPherson's nervousness did not provide reasonable suspicion of drug possession in order to justify investigative detention beyond the traffic stop. If Washington is not followed in the instant case, I believe that it should be overruled.
In United States v. Perkins, supra, Perkins was stopped by Officer Colston of the Alabama Highway Patrol for a lane violation on the interstate and was given a warning ticket. However, after completing the warning citation, "Colston continued to detain Perkins because of his nervousness; what he perceived as Perkins' evasive behavior in response to his questions; and his hunch that Perkins was being untruthful about his destination." United States v. Perkins, 348 F.3d at 968. When Perkins refused to allow Colston to search his car, Colston called for a drug-sniffing dog to come to the scene. Ultimately, narcotics were found in the car and Perkins was arrested. The trial court granted Perkins's motion to suppress the narcotics. The United States Court of Appeals for the Eleventh Circuit found that the following circumstances, "separately or cumulatively, cannot support a legitimate inference of further illegal activity that rises to the level of objective, reasonable suspicion required under the Fourth Amendment":
"(1) Perkins' nervousness; (2) the `odd behavior' of Perkins in repeating the questions Colston asked him; (3) Perkins' possession of a Florida driver's license while claiming to live in Montgomery, Alabama; and (4) the `inconsistent' statements from Perkins and Scott with regard to whom they were going to see in Greenville, Alabama."
United States v. Perkins, 348 F.3d at 970 (footnote omitted).
The Perkins court stated in regard to the above facts:
"In this Circuit, we have required more than the innocuous characteristics of nervousness, a habit of repeating questions, and an out-of-state license for giving rise to reasonable suspicion. See United States v. Pruitt, 174 F.3d 1215, 1221 (11th Cir.1999) (holding that the fact that the driver was Hispanic and had an out-of-state license plate was not enough to detain him beyond the issuance of the speeding ticket); United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir.1990) (`[B]eing Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates (not yet a crime in Alabama) ... fail to suggest that appellant ... [was] engaged in any criminal activity other than speeding on the highway.')."
United States v. Perkins, 348 F.3d 965 at 971. See also, Joshua v. DeWitt, 341 F.3d 430, 445 (6th Cir.2003)("`[N]ervous, evasive behavior' is the standard to justify reasonable suspicion, not nervousness or restlessness."); United States v. Chavez-Valenzuela, 268 F.3d 719, 726 (9th Cir.2001)("[N]ervousness during a traffic stop  even the extreme nervousness [the defendant] exhibited here  in the absence of other particularized, objective factors, does not support a reasonable suspicion of criminal activity, and does not justify an officer's continued detention of a suspect after he has satisfied the purpose of the stop. [The officer] lacked the requisite reasonable suspicion when he continued to detain [the defendant] after completing the traffic stop and asked him if he was carrying drugs, thereby violating [the defendant's] *457 Fourth Amendment rights.")(footnote omitted); Peters v. State, 859 So.2d 451, 454 (Ala.Crim.App.2003)("The prevailing view is that `unless coupled with additional and objectively suspicious factors, nervousness in the presence of a police officer and/or failure to make eye contact do not establish reasonable suspicion to believe that the person is engaged in criminal activity.' [State v.] Washington [,623 So.2d 392] at 398 [(Ala.Crim.App.1993).]"); Abner v. State, 741 So.2d 440, 445 (Ala.Crim.App.1998)("' "While there is some authority to the contrary, the majority view appears to be that, unless coupled with additional and objectively suspicious factors, nervousness in the presence of a police officer and/or failure to make eye contact do not establish reasonable suspicion to believe that the person is engaged in criminal activity."' Hopkins v. State, 661 So.2d 774, 780 (Ala.Cr.App.1994), quoting State v. Washington, 623 So.2d 392, 398 (Ala.Cr.App.1993).").
Like nervousness, the additional facts that McPherson was in lawful possession of a pistol and had no proof of current automobile insurance are irrelevant to the question whether there was reasonable suspicion to detain McPherson for possession of illegal drugs. Those facts do not provide reasonable suspicion of drug possession in order to justify investigative detention beyond the traffic stop.
Moreover, under to the de novo standard of review that applies in this case, I have watched the videotape of the encounter between Officer Peoples and McPherson and have reached the same conclusion as the one expressed by the trial judge:
"THE COURT: Well, I don't want to second-guess the officer. I wasn't there putting myself in his position out there on the highway. But I observed the tape and I observed the defendant, and I heard him speak. And I know nervousness is a subjective thing. But I didn't find any great high anxiety, no great high degree of excitement or what appeared to be nervousness. Even when the dog was around the car, based on my observation, where there was any great degree of nervousness in his speech or his actions.
"MR. THOMPSON [the prosecutor]: I respect what you saw. But you have to also keep in mind that the majority of the time there was no camera on the defendant.
"THE COURT: I understand. I am not second-guessing the officer. He was out there on the scene. He was listening. I am saying what I observed. And in fact he asked the guy  the defendant whether he was nervous. He said, no, I am not nervous. And I listened to the tone of voice very attentively to see what is it we are dealing with here. I don't find high excitement. Perhaps the officer found there may have been."
(R. 37-38.)
I am in agreement with the trial court's observation that while there are several minutes in which only the arresting officer could observe McPherson, there is nothing on the videotape, either from the sound of McPherson's voice or his physical demeanor, suggesting that McPherson was inordinately nervous during the stop. Therefore, even if nervousness alone could justify an officer's continuing detention in these circumstances, the detention of McPherson would not have been justified here because McPherson was not exceedingly nervous. Therefore, I respectfully dissent.
WISE, J., concurs.
NOTES
[1] The Court stated that although this fact might indicate that the car was stolen, it was clear that Officer Eller detained Washington to investigate the possibility that he was transporting illegal drugs and not to determine whether the car was stolen.