GROSS, J:
Hilaire Poliar appeals the denial of his dispositive motion to suppress, after which he entered a- guilty plea to drug trafficking. Following a lawful traffic stop, a dog alerted to drugs in the back seat of Pol-iar’s car. A further search revealed three *1014 kilograms of cocaine. We affirm, finding that reasonable suspicion supported Pol-iar’s twenty-minute detention until-the dog search uncovered the drugs.
The issue is whether the dog search occurred during a legal detention. As the United States Supreme Court observed in Illinois v. Caballes, — U.S. -, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), “[a] seizure that is justified solely by the interest in issuing a warning ticket to a driver can become unlawful if it is prolonged beyond the time reasonably required to complete that [initial] mission.” Id. at 837. It follows that if the dog search occurred while Poliar “was being unlawfully detained,” then the cocaine would be the product of an unconstitutional seizure.[1] Id.
In this appeal, we review legal conclusions de novo but defer to the trial court’s factual findings and interpret the evidence, reasonable inferences, and deductions derived from the evidence in a manner most favorable to sustaining the trial court’s ruling. See Pantin v. State, 872 So.2d 1000, 1002 (Fla. 4th DCA 2004); State v. Manuel, 796 So.2d 602, 604 (Fla. 4th DCA 2001).
A stop of an automobile for a traffic violation must be limited to the time required to write the citation, unless there is a reasonable suspicion for a lengthier detention. See Cresswell v. State, 564 So.2d 480, 481 (Fla.1990) (noting that absent additional evidence of criminal activity, a person who has been stopped for a traffic violation may not be detained for a period longer than is necessary to write a traffic citation); Sanchez v. State, 847 So.2d 1043, 1046 (Fla. 4th DCA 2003). A reasonable suspicion that justifies a detention beyond the time needed to issue a traffic citation must be based on articula-ble facts that criminal activity is occurring. See Cresswell, 564 So.2d at 481-82; Nulph v. State, 838 So.2d 1244, 1245 (Fla. 2d DCA 2003). “When making a determination of reasonable suspicion, [a reviewing court] must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.” United States v. Perkins, 348 F.3d 965, 970 (11th Cir.2003) (citations omitted).
In this case, Trooper Hardley of the Florida Highway Patrol properly developed a reasonable suspicion of criminal activity that justified the twenty-minute detention after the initial stop for excessively tinted windows.[2]
When he first spotted the trooper on the Florida Turnpike, Poliar .slowed his Honda Accord down to about 50 miles per hour, *1015 eventually cutting his speed to 30 miles per hour. The minimum speed limit was 40 miles per hour. The trooper’s experience was that other people do not slow to such a low speed on the turnpike when they see a trooper.
For the trooper, the most significant factor in the encounter was Poliar’s extreme nervousness. When the trooper asked him for his driver’s license, Poliar was “shaking like a leaf’; while the trooper had seen other nervous drivers during his twenty-year career, he had never confronted someone as nervous as Poliar.
As the trooper was examining the window tint on the vehicle, he asked Poliar for his current home address. Poliar provided a street name that differed from the one on the license. When the trooper again asked for an address, Poliar gave the correct street name, but was unable to come up with a house number. Because of the common occurrence of identity theft, the trooper routinely asked for a driver’s street address to verify that the driver was the person listed on the license.
Once Poliar was unable to give a street number for his home address, the trooper asked him for his date of birth. Poliar responded with a birthday different from the one on the license.
Poliar said he was traveling to Orlando from Miami, which, based on his experience, the trooper knew to be a source city for the narcotics trade. The trooper saw no luggage in the car. He asked Poliar if he had ever been arrested. Poliar replied yes for immigration, but not for anything else.
Approximately four minutes after the initial stop, the trooper returned to his patrol car, requested a criminal history and a license check, and called for a K-9 unit to assist him. While he was waiting, the trooper began to write up a citation for the tinted windows. The driver’s license check came back as valid. The criminal history check indicated that Poliar had a previous drug arrest in Orlando, a fact that he had lied about minutes earlier.
The trooper contacted the El Paso Intelligence Center to run a “pipeline” check to see if the appellant appeared on a federal database such as INS, DEA, FBI, NAD-DIS, or Customs. The Center told the trooper that there was a FAA and INS record on the appellant, indicating some type of immigration problem.
The trooper questioned Poliar further about his prior criminal history. Although he admitted to a drug arrest in the Bahamas, he would not respond to the trooper’s questions about the Orlando drug arrest. The trooper then issued Poliar the faulty equipment notice.
The circuit judge found that the combination of these factors caused the trooper to ask “Poliar if he could check his car for illegal drugs. Mr. Poliar consented to the search.” The narcotics dog then arrived on the scene and located the contraband.
Taken together, these factors amounted to a reasonable suspicion of criminal activity that justified Poliar’s detention until the drug dog alerted to drugs in the back seat of the Honda, which occurred within twenty minutes of the traffic stop.
Poliar’s excessive nervousness, his inability to answer simple questions about his birth date and home address, his deceit in failing to disclose his previous drug arrest, his travel from Miami, and questions about his immigration status justified Poliar’s detention for further questioning and investigation for a period of time beyond that necessary to write a citation and do a computer check of his background. This was not a case where the driver should have been “free to go” after the citation issued. See State v. Brown, 691 So.2d 637, 638 (Fla. 5th DCA 1997) (noting that while the general rule is that a detention must end at the time a traffic citation is completed, this “presupposes that once the *1016 citation is issued, the traffic stop is completed and the driver is free to go”).
We distinguish this case from Eldridge v. State, 817 So.2d 884 (Fla. 5th DCA 2002). The fifth district determined in Eldridge that the officer did not have a reasonable suspicion of criminal activity in circumstances similar to this case. To argue for reasonable suspicion in Eldridge, the State pointed to the defendant’s “nervousness upon being stopped, his failure to provide a specific street address for his residence, and his possession of a large roll of $100 bills in his pocket.” Id. at 888.
In contrast to Eldridge, Poliar’s conduct was more suggestive of illegal activity. Here the trooper described Poliar’s extreme nervousness, as opposed to the normal anxiety a citizen is expected to feel in a traffic stop. Poliar was not only unable to provide a street address, he initially could not name the street where he lived and then did not know the house number. Poliar was unable to provide the most basic of information, his birth date. He also lied to the trooper regarding his criminal history.
Maxwell v. State, 785 So.2d 1277 (Fla. 5th DCA 2001), is also distinguishable. There, the trooper asked over fifty questions to the driver he detained for a traffic violation, which was deemed to be “purposeless unless its purpose was a fishing expedition and a delaying tactic to allow time for the K-9 unit to arrive.” Id. at 1279. Here, the trooper asked sensible questions under the circumstances in the three to four minute initial detention, responding appropriately as Poliar’s responses altered the dynamics of the stop.
Affirmed.
KLEIN and MAY, JJ., concur.

. Florida courts have held where an officer ' does not have justification for a lengthy detention, a driver may be subject to a canine search of a car's exterior only within the time frame required to issue a citation. For example, in Sparks v. State, 842 So.2d 876 (Fla. 2d DCA 2003), a twenty-minute delay between writing a citation for a non-working headlight and the arrival of a canine unit to search the vehicle was deemed an illegal detention. The officer completed writing the headlight citation before the .arrival of the canine unit, but did not give the citation to the defendant, nor did the officer convey to the defendant that he was free to leave. C.f. Lecorn v. State, 832 So.2d 818 (Fla. 5th DCA 2002) (holding that there was no unlawful detention where canine unit arrived on the scene four minutes after officer asked defendant to exit vehicle relating to citation for tinted windows); Sands v. State, 753 So.2d 630 (Fla. 5th DCA 2000) (holding that stop of vehicle was not unnecessarily prolonged where canine dog arrived fifteen minutes after traffic stop and where officer was still writing ticket for violation when the dog arrived).

. Poliar conceded at the suppression hearing that the trooper was entitled to stop and detain him due to the tinted windows. The windows were so heavily tinted that the occupants could not be seen from outside the car.