[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-14263
Non-Argument Calendar

_____

D.C. Docket No. 2:15-cr-00059-SPC-MRM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

YOHANY HERNANDEZ-HERNANDEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 27, 2017)

Before HULL, WILSON, and EDMONDSON, Circuit Judges.

PER CURIAM:

Defendant Yohany Hernandez-Hernandez appeals his conviction for unlawful transportation of illegal aliens.  He attacks the district court's denial of Defendant's motion to suppress evidence obtained following a traffic stop.  In particular, Defendant contends the police violated the Fourth Amendment by detaining him longer than was necessary to process the original traffic violation and in the absence of reasonable suspicion of further criminal activity.[1]  Defendant argues the evidence discovered as a result of that detention should have been suppressed.  No reversible error has been shown; we affirm.

In considering the district court's denial of a motion to suppress, we review fact determinations for clear error and the application of law to the facts de novo.  United States v. Boyce, 351 F.3d 1102, 1105 (11th Cir. 2003).  We construe all facts in the light most favorable to prevailing party -- in this case, the government; "we afford substantial deference to the factfinder's credibility determinations, both explicit and implicit."  United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012).

---

[1] In the district court, Defendant raised three additional grounds in support of suppression: (1) that the initial traffic stop was unlawful; (2) that no lawful basis existed to search Defendant's vehicle; and (3) that statements made by Defendant were obtained in violation of Miranda v. Arizona, 86 S. Ct. 1602 (1966).  Defendant has abandoned expressly these arguments on appeal.

The Fourth Amendment protects people from "unreasonable searches and seizures" by government officials; "and its protections extend to brief investigatory stops of persons or vehicles . . . ." United States v. Arvizu, 122 S. Ct. 744, 750 (2002). We have said that a traffic stop must be of "limited duration." Boyce, 351 F.3d at 1106. Generally speaking, a traffic stop may last no "longer than necessary to process the traffic violation." United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). The duration of a traffic stop may, however, be lawfully prolonged when an officer can articulate a reasonable suspicion of illegal activity beyond the initial traffic offense. Id.

"[R]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Illinois v. Wardlow, 120 S. Ct. 673, 675 (2000) (quotation omitted). "When making a determination of reasonable suspicion, we must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003) (quotations omitted). An officer has reasonable suspicion when he can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" detaining a driver beyond the initial traffic stop. Boyce, 351 F.3d at 1107 (quotation omitted). The reasonable-suspicion standard allows police officers "to draw on their own

3

experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Arvizu, 122 S. Ct. at 750-51 (quotations omitted). Thus, conduct which could be considered unremarkable under some circumstances might establish reasonable suspicion based on an officer's "specialized training and familiarity with the customs of the area's inhabitants." Id. at 752.

Briefly stated, Detective Lockhart initiated the traffic stop at issue in this appeal after seeing an SUV driven by Defendant make an illegal lane change.[2] Immediately after stopping the SUV, Detective Lockhart ran the SUV's license plate and learned that the SUV was a rental car. When Detective Lockhart approached the SUV, he noticed several personal items -- including stuffed animals, sticks and beads -- hanging from the rear-view mirror and a religious doll in the center console. The SUV also had after-market window shades that had been placed on the rear windows. Detective Lockhart observed that the SUV had in it six passengers "of Spanish descent," who looked very scared -- "like they saw a ghost" -- and who avoided making eye contact with him.

Detective Lockhart asked Defendant for his driver's license, and Defendant handed over his Texas driver's license. Detective Lockhart then asked Defendant to step out of the SUV and to stand outside the patrol car while Defendant's

---

[2] Defendant concedes that the initial traffic stop was valid.

4

driver's license was checked.  Defendant appeared nervous and continued to look toward the SUV, which Detective Lockhart testified was common behavior when a person is carrying something illegal in a car.

Meanwhile, about a minute into the traffic stop -- as Defendant was getting out of the SUV -- Sergeant Treska arrived on the scene.  Sergeant Treska noticed that the SUV was a rental car, that several personal items were hanging from the SUV's rear-view mirror, and that after-market shades had been placed over the windows.  Sergeant Treska also saw that there was an Elegua figurine in the center console, which he testified is often used by drug cartels as a kind of "patron saint" to protect them from law enforcement.

Sergeant Treska said he noticed that Defendant appeared to be of Cuban descent while his six passengers appeared to be of different nationalities, including of Mexican and Guatemalan descent.  Sergeant Treska also testified that the SUV's passengers looked exhausted and that one female passenger in particular looked to be on the verge of tears.  Sergeant Treska testified that he was unable to communicate effectively with the passengers because they spoke only Spanish. Based on his observations, however, Sergeant Treska became concerned that the female passenger was being held against her will.  Sergeant Treska then told Detective Lockhart that they "had a donkey," meaning a human trafficking case.

5

Because Detective Lockhart was having difficulty communicating with Defendant -- who appeared to speak mainly Spanish -- Detective Lockhart requested assistance from Detective Camacho, a native Spanish-speaker. Detective Lockhart estimated that Detective Camacho arrived about 12 minutes after the initial traffic stop. After speaking with Defendant and with one of Defendant's passengers, Detective Camacho told Detective Lockhart and Sergeant Treska that he believed that Defendant was involved in human smuggling. Defendant was later arrested.

Considering the totality of the circumstances in this case, we conclude that Detective Lockhart and Sergeant Treska, speedily enough, formed a reasonable, articulable suspicion that Defendant was engaged in criminal activity beyond the initial traffic violation. First, both officers observed that Defendant was driving a rental car that had been personalized with items hanging from the rear-view mirror and after-market window shades. Based on their experience and training, the officers recognized the personal additions as characteristic of criminals attempting to avoid detection. Second, Defendant was driving six adults of what appeared to be differing Hispanic descents coming from an area near the Mexican border, along a route known to the officers for human trafficking and smuggling. Third, Defendant appeared nervous and looked repeatedly at the SUV, which was also indicative of a person who was concealing contraband. Fourth, Defendant's

6

passengers were visibly exhausted and frightened, including one female passenger who appeared so upset that Sergeant Treska suspected she was being held against her will.

While each observation considered in isolation may not have been strongly probative of criminal activity, when considered cumulatively and in the light of the officers' experience and training, the officers' observations constituted sufficient articulable reasonable suspicion that Defendant was engaged in criminal activity. See United States v. Bautista-Silva, 567 F.3d 1266, 1272-73 (11th Cir. 2009) ("We may not consider each fact only in isolation, and reasonable suspicion may exist even if each fact 'alone is susceptible to innocent explanation.'").

We do agree with the district court's determination that the officers developed reasonable suspicion before the time the officers could have reasonably effectuated the purpose of the initial traffic stop. A video recording of the traffic stop shows that Detective Lockhart and Sergeant Treska each approached Defendant's SUV -- and made the pertinent observations giving rise to reasonable suspicion -- within the first three minutes of the traffic stop.

To the extent Defendant was detained beyond the duration of the initial traffic stop, his detention was supported by articulable reasonable suspicion. No Fourth Amendment violation occurred; we affirm the denial of Defendant's motion

to suppress.

AFFIRMED.