[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12397

_____

D.C. Docket No. 1:15-cr-00245-WSD-CMS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PATRICK HEARD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 12, 2018)

Before ROSENBAUM, JILL PRYOR and RIPPLE,[*] Circuit Judges.

JILL PRYOR, Circuit Judge:

_____

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

Patrick Heard appeals his conviction for possession of a firearm by a convicted felon under 18 U.S.C. §§ 922(g) and 924(a)(2).  After careful review, with the benefit of oral argument, we conclude that the officers who arrested Heard lacked reasonable suspicion to conduct a *Terry*[1] stop.  Because his motion to suppress should have been granted, we vacate Heard's conviction and remand for further proceedings consistent with this opinion.

## I.    BACKGROUND

### A.  Heard's Arrest

The following facts were elicited at two hearings on Heard's motion to suppress, one before a magistrate judge and one before the district court.[2]

One evening in early March, just after 6:30 p.m., Frank Sanders was working as a security guard at an apartment complex in Marietta, Georgia.  While on duty, he saw a group of young men walk toward a wooded area behind some of the apartment buildings.  Soon after, he heard gunshots coming from the woods.  After approaching the woods, where he could not see anyone, Sanders called 911

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

[2] The first hearing took place almost two years after Heard's arrest, and the second took place nearly three years afterward.  The witnesses' testimony contained a lot of inconsistencies. The district court resolved some of these inconsistencies in its findings of fact, which we review only for clear error.  *See infra* Part II.B.1.  We recite the facts consistently with the district court's findings, unless otherwise noted.

Citations to "Doc. #" refer to the numbered entry on the district court's docket.  The magistrate judge's hearing is at Doc. 35; the district court's hearing is at Doc. 69.

2

and reported the gunshots.  Sanders placed the 911 call approximately five to eight minutes after hearing shots fired.

Marietta Police Department patrol officer John Bisker was dispatched in response to Sanders's call.  The dispatcher, who spoke to Bisker at approximately 6:45 p.m., told Bisker only that someone had reported gunshots at the apartment complex.  The dispatcher did not describe any suspects.  Bisker, who had been on the force as a patrol officer for approximately six months, was familiar with the apartment complex as a high crime area.  Bisker arrived at the complex approximately five to seven minutes after he spoke with the dispatcher.

After entering the gated complex, Bisker spoke to Sanders.  Sanders told Bisker that he had heard gunshots near the woods but had been unable to locate the shooter.  Sanders pointed toward the woods to indicate where the gunshots had originated.  The two spoke for three to four minutes.[3]  At this point, somewhere between 13 and 19 minutes had elapsed since Sanders reported hearing the gunshots, based on the time frames Sanders and Bisker described.

Bisker began to patrol in his marked police car through the apartment complex, heading toward the wooded area.  After driving around for "a couple of

---

[3] Aside from his testimony about reporting the gunshots and the approximate timing of Bisker's arrival, the district court found Sanders not credible.  We are in no position to disturb that finding; so we, like the district court, do not rely on his testimony beyond this point.  *See United States v. Holt*, 777 F.3d 1234, 1255 (11th Cir. 2015) ("We accept the factfinder's choice of whom to believe unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." (internal quotation marks omitted)).

3

minutes," maybe "five or ten minutes," and not seeing anyone or any additional evidence of criminal activity, Bisker saw Heard standing in the grass walking a small dog. Doc. 35 at 46; Doc. 69 at 14. Heard was standing "near the front of" an apartment building, Doc. 35 at 15, by the woods Sanders had pointed out. At this point, approximately 15 to 29 minutes had passed since Sanders had heard the gunshots.

Bisker parked his car and approached Heard. Bisker asked Heard whether he had heard gunshots; Heard said that he had and indicated that the gunshots came from the woods behind him. Bisker asked Heard for identification, and Heard provided him with ID. Heard's identification did not confirm that he lived within the apartment complex,[4] so Bisker asked where Heard lived. Heard said that his mother lived there and pointed to the apartment building closest to where he was standing with his small dog. Bisker believed this response to be "a little defensive" and an indirect answer to his question. Doc. 69 at 20. Bisker then asked Heard for his mother's apartment number, and Heard did not provide a number.[5] Bisker observed that Heard was swaying slightly. Based on his swaying and "overall demeanor," Bisker thought "possibly [Heard] . . . wasn't supposed to be there." *Id.*

---

[4] It is unclear from the record whether Heard's ID listed no address or whether it listed an address different from that of the apartment complex.

[5] Bisker did not testify to how Heard responded to his question, if at all. All we know from his testimony is that Heard did not provide an apartment number.

4

at 20-21.  At some point during the brief conversation Heard told Bisker he was there to walk his dog.

At this point, Marietta Police officer Daniel Dilworth arrived on the scene in uniform and in a marked police car.  Dilworth also knew the apartment complex as a high crime area.  Dilworth parked his car near Bisker's, got out, and approached Heard and Bisker.  As he approached, Dilworth observed an unoccupied vehicle, approximately 15 or 20 feet away, with a smashed windshield and a stick holding the trunk open.  Dilworth took note of the vehicle as "an area of responsibility," but decided that he and Bisker "could address the car when we concluded this interview with Mr. Heard."  *Id.* at 84.  Dilworth then formed a "safety L" with Bisker:  Bisker stood in front of Heard and Dilworth stood slightly behind and to Heard's side.  Doc. 35 at 48.  The officers used this tactical stance so they could "see all angles" of Heard "in case [he] would pull a weapon."  *Id.* at 19.

Upon his arrival, Dilworth observed that Heard's conversation with Bisker was "low-key" and "amicable," "very much a normal conversation [that] you might have, albeit [with] a stranger."  Doc. 69 at 78.  Soon after Dilworth's arrival, Bisker asked Heard for permission to search him because he wanted to make sure Heard was not carrying a weapon.  Heard responded that "he had not done anything wrong."  Doc. 35 at 29.  At that point, only one of the officers, Dilworth, observed a change in Heard's demeanor; Heard's "voice [became] more

5

animated," which indicated to Dilworth that Heard "was opposed to answering any more questions" although "[b]y no means were [Heard's statements] explosive." Doc. 69 at 79, 95.  Heard's hands became animated "as a gesture of I don't agree with this."  *Id.* at 81.

Dilworth testified that he instructed Heard to keep his hands by his side. Bisker testified that Dilworth directed Heard to raise his hands so the officers could pat him down for weapons.  Heard again stated that he had done nothing wrong. Bisker—but not Dilworth—testified that Heard raised his hands and lowered them several times.[6]  This caused Bisker to think Heard "may have had a weapon or that he wanted to get his hands towards his waist to hold a weapon from maybe moving."  *Id.* at 65.  But Bisker took no action.  Dilworth testified that he observed that Heard was "rigid in his stance" or "[t]ense" and believed based on "instinct" that Heard had a weapon.  *Id.* at 79, 82, 90.  Acting on this instinct, Dilworth approached Heard and searched him.

While he was searching Heard's person, Dilworth recognized a gun and said "gun."  *Id.* at 27.  Bisker drew his gun and held it in a "low ready" position while Dilworth recovered Heard's gun, then the officers took Heard into custody.  *Id.* Bisker searched police records and found that Heard was a convicted felon.

---

[6] The officers were unaware at the time that Heard was wearing a colostomy bag because of a previous injury.

6

## B.  Procedural History

Heard was charged with possession of a firearm as a convicted felon.  He moved to suppress the gun, arguing that the officers lacked sufficient cause to *Terry* stop and search him.

A magistrate judge held an evidentiary hearing on the motion to suppress, at which Bisker and Sanders testified.[7]  After Bisker's testimony, the government invoked the rule of sequestration.  The magistrate judge issued a report and recommendation ("R&R") recommending that Heard's motion to suppress be granted.  The government objected to the R&R, and the district court held a second evidentiary hearing at which Bisker, Sanders, and Dilworth testified.

At the start of the second hearing, the government again invoked the rule of sequestration.  Dilworth testified that in preparing for the second hearing, he had reviewed a portion of the transcript of Bisker's testimony from the first hearing.  Bisker testified that he had reviewed his own "case notes from the last hearing." Doc. 69 at 32.  In post-hearing briefing, Heard argued that Dilworth's and Bisker's testimony should be stricken from the record because the officers violated the rule of sequestration.  He also maintained that the officers lacked reasonable suspicion that he was engaged in criminal conduct at the time he was stopped.

---

[7] Betty Benning, Heard's mother, also testified at the hearing, confirming that at the time of his arrest Heard lived with her at the apartment complex.

The district court declined to adopt the R&R and denied Heard's motion to suppress. With respect to Dilworth's testimony, the district court determined that although the rule of sequestration had been invoked at both hearings, neither party had requested sequestration between the two hearings; therefore, there was no violation.[8] The district court alternatively found that even if there was a violation, Heard suffered no prejudice. Even if Dilworth reviewed the first few pages of Bisker's testimony from the first hearing, that testimony concerned events that occurred before Dilworth arrived at the complex, and naturally Dilworth did not testify about those events. Moreover, the court found "Dilworth credible and uninfluenced by his limited review of Bisker's prior testimony." Doc. 74 at 18. As to Bisker's testimony, the district court rejected Heard's claim that Bisker's reference in the second hearing to "case notes from the last hearing" meant that Bisker had reviewed the transcript from the first hearing. *Id.* at 18 n.16. Thus, the district court concluded, Heard failed to show "that Bisker violated the sequestration rule, that he or the Government 'connived' to violate the rule, or that the claimed violation resulted in 'actual prejudice'" to him. *Id.*

Proceeding to the merits of the motion to suppress, the district court found that the interaction between Bisker and Heard was consensual "at least until Bisker asked [Heard] for permission to pat him down for weapons." *Id.* at 23. The

---

[8] We note that, at the time the first hearing concluded, the parties were unaware that the district court would hold a second hearing.

8

district court assumed that at that point the encounter became an investigatory *Terry* stop and determined that the officers had reasonable suspicion at this moment to conduct the stop. The court found the following facts supportive of reasonable suspicion: the officers knew the apartment complex was a high crime area; it was dark outside; Bisker encountered Heard near the location of reported gunfire "shortly after the shots were reported," *id.* at 24; the officers had no description of any suspect and saw no one else in the immediate area; Heard was standing in "probably the most remote" part of the complex, *id.*; there was a nearby vehicle with a smashed windshield; Heard's ID did not verify that he lived in the complex; Heard pointed to rather than verbally identifying his mother's apartment, which Bisker understood to be "defensive"; Heard failed to provide an apartment number when asked; and Heard was swaying.

The district court also found that the officers' pat down was supported by reasonable suspicion. Because the officers reasonably suspected that Heard was involved in the reported gunfire, the officers' belief that Heard was armed and dangerous necessarily was reasonable.

Heard entered a conditional guilty plea in which he reserved his right to challenge the denial of his motion to suppress on appeal. The district court sentenced Heard to 10 months' imprisonment followed by two years of supervised

9

release.  This is his appeal.  We note that Heard is scheduled for release on April 30, 2018.

## II.    DISCUSSION

### A.  Alleged Violation of the Rule of Sequestration

Heard asserts that the officers' testimony at the suppression hearing before the district court should be stricken from the record because the government intentionally violated the rule of sequestration by giving Dilworth a transcript of Bisker's testimony from the magistrate judge's suppression hearing.  He argues, too, that Bisker's reference in the second hearing to reviewing "case notes from the last hearing" was an admission that he reviewed the transcript of his prior testimony, so that his testimony also should have been stricken.  We review for an abuse of discretion the district court's decision whether to impose sanctions for a violation of the rule of sequestration.  *See United States v. Jimenez*, 780 F.2d 975, 980 (11th Cir. 1986) (holding that the district court did not abuse its discretion in declining to grant a mistrial or strike testimony due to a violation of a sequestration order).  Even assuming the officers violated the rule of sequestration, the district court was within its discretion to decline to strike their testimony.

Once a party invokes the rule of sequestration, the district court must exclude witnesses from court proceedings to prevent them from hearing one another's testimony.  Fed. R. Evid. 615.  "The rule of sequestration prohibits

10

witnesses from conversing with one another during the entire course of the trial." *United States v. Blasco*, 702 F.2d 1315, 1327 (11th Cir. 1983).  "The purpose of the sequestration rule is to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion."  *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1373 (5th Cir. July 23, 1981).[9] Reading the transcript of another witness's testimony constitutes a violation of the rule of sequestration.  *Jimenez*, 780 F.2d at 980 n.7.  Indeed, "[t]he harm may be even more pronounced with a witness who reads trial transcript than with one who hears the testimony in open court, because the former need not rely on his memory of the testimony but can thoroughly review and study the transcript in formulating his own testimony."  *Miller*, 650 F.2d at 1373.

When a witness violates the rule of sequestration, the district court may impose sanctions, including citing the violator for contempt, allowing cross-examination regarding the nature of the violation, or, when a party has "suffered actual prejudice, and there has been connivance by the witness or counsel to violate the rule, the court may strike testimony already given or disallow further testimony."  *Blasco*, 702 F.2d at 1327.  Absent such misconduct, however, allowing cross-examination ordinarily has the "curative aspect" of equipping the

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit Court of Appeals handed down before October 1, 1981.

11

fact-finder to evaluate the violating witness's credibility. *United States v. Eyster*, 948 F.2d 1196, 1211 (11th Cir. 1991).

On this record, we cannot say the district court abused its discretion by declining to strike Dilworth's testimony. Defense counsel learned of the possible violation during the hearing before the district court and had an opportunity to cross-examine Dilworth on the subject. The district court, with the benefit of briefing on the sequestration issue, concluded that any violation was not prejudicial based on two determinations: (1) any testimony Dilworth reviewed related only to events about which he did not—and could not—testify; and (2) Dilworth was credible, in part "because the officers' testimonies were not entirely consistent." Doc. 74 at 18. Heard has failed to offer us sufficient reason why, in light of these findings, the district court's consideration of Dilworth's testimony was an abuse of discretion.

Nor can we say the district court abused its discretion in declining to strike Bisker's testimony. Bisker's reference to reviewing "case notes from the last hearing" is ambiguous. Heard urges us to infer from this statement that Bisker admitted to reviewing the transcript of his own prior testimony.[10] But Bisker could just as easily have been referring to a review of his police report of the encounter with Heard, which he and the parties referenced repeatedly during the hearing

---

[10] Heard seems to assume that a witness's review of his own prior testimony would violate the rule of sequestration, but he cites no case in support.

12

before the magistrate judge.  Moreover, as with Dilworth, defense counsel had an opportunity to cross-examine Bisker on the facts relevant to the sequestration issue, and the district court was able to evaluate Bisker's credibility following his live testimony and the parties' briefing on the issue.  On these facts, the district court was well within its discretion to consider Bisker's testimony.

For these reasons, we will not disturb the district court's consideration of the officers' testimony.  We now consider whether, taking their testimony into account, Heard's motion to suppress should have been granted.

## B.  Motion to Suppress

We first provide the legal framework for our analysis under *Terry v. Ohio*, 392 U.S. 1 (1968).  Second, we explain why we conclude that the *Terry* stop was initiated when Dilworth ordered Heard to keep his hands at his side or raise them. Third, we discuss why the officers lacked reasonable suspicion at that point in time.  Because the officers lacked reasonable suspicion when they initiated the *Terry* stop, the stop and the search both were unlawful.

### 1.  *The Fourth Amendment and* Terry *Stops*

"The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Ornelas v.*

13

*United States*, 517 U.S. 690, 696 (1996).  "The first part of the analysis involves only a determination of historical facts."  *Id.*  We review these fact findings for clear error.  *United States v. Ramirez*, 476 F.3d 1231, 1235 (11th Cir. 2007); *see also United States v. Newsome*, 475 F.3d 1221, 1223-24 (11th Cir. 2007) (explaining that, when considering a motion to suppress, we construe the district court's factual determinations in the light most favorable to the prevailing party). And "we afford substantial deference to the factfinder's credibility determinations, both explicit and implicit."  *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012).  "[T]he second [part of the reasonable suspicion analysis] is a mixed question of law and fact" that we review *de novo*.  *Ornelas*, 517 U.S. at 696-97.

The Fourth Amendment guarantees protection against "unreasonable searches and seizures."  U.S. Const. amend. IV.  "A seizure takes place whenever a police officer accosts an individual and restrains his freedom to walk away." *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003) (internal quotation marks omitted).  Yet not every encounter with the police constitutes a seizure.  A "brief, consensual and non-coercive interaction[ ]" is not a seizure.  *Id.* Conversely, when a police officer "by means of physical force or show of authority . . . has in some way restrained the liberty of a citizen," a seizure has occurred. *Terry*, 392 U.S. at 19 n.16.  The line between the two is marked by whether "a

14

reasonable person would not feel free to terminate the encounter." *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (internal quotation marks omitted).

Officers may conduct a brief investigatory stop, a so-called *Terry* stop, "where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry*, 392 U.S. at 19-20). "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (internal quotation marks omitted). "The reasonable suspicion that is required must be more than a mere hunch; we must focus on 'the specific reasonable inferences which (the officer) is entitled to draw from the facts in light of his experience.'" *United States v. Ballard*, 573 F.2d 913, 915 (5th Cir. 1978) (quoting *Terry*, 392 U.S. at 27). "Unless, at the time of the stop, the officers could point to 'specific articulable facts . . . that reasonably warrant suspicion . . . ,' the stop cannot be justified." *Id.* (quoting *United States v. Brignoni-Ponce*, 422 U.S. 837, 884 (1975)).

When considering whether officers had reasonable suspicion to conduct a *Terry* stop, a court cannot single out particular factors; rather, it "must examine the

15

totality of the circumstances." *Lewis*, 674 F.3d at 1303; *Cf. District of Columbia v. Wesby*, No. 15-1485, 2018 WL 491521, at \*6, 9-10 (U.S. Jan. 22, 2018). "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). And "[t]he question . . . is not whether a specific arresting officer . . . actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed." *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (internal quotation marks omitted).

"Under the exclusionary rule, evidence obtained in an encounter that is in violation of the Fourth Amendment . . . cannot be used in a criminal trial against the victim of the illegal search and seizure." *Perkins*, 348 F.3d at 969.

### 2. *Initiation of the Terry Stop*

Initially, we agree with the district court that at least up to the point when Bisker asked for permission to pat Heard down for weapons, the interaction between Bisker and Heard was consensual and did not implicate the Fourth Amendment. *See Florida v. Bostick,* 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). In this initial interaction, the conversation between Bisker and Heard was "amicable" and "low-key . . . very much a normal conversation." Doc. 69 at

16

78. Heard answered Bisker's questions, and Bisker did not "'by means of physical force or show of authority . . . restrain[] [Heard's] liberty.'" *Bostick*, 501 U.S. at 434 (quoting *Terry*, 392 U.S. at 19 n.16).

The district court assumed that the officers had seized Heard such that their encounter became a *Terry* stop when Bisker asked Heard for permission to search him. Although Heard asks us to adopt this assumption, we note that it is in tension with the undisputed fact that Bisker sought Heard's consent. By asking for permission to search Heard,[11] Bisker apparently accepted that he lacked particularized, articulable facts suggesting that Heard was involved in the gunshots or posed an immediate threat to the officers. *See id.* at 434-35 (explaining that an officer may "generally ask questions" of an individual, "ask to examine the individual's identification," and request permission to search the individual's belongings without transforming an encounter into a seizure). We need not resolve this tension, however, because even if a reasonable person would have felt free to terminate the encounter, *Jordan*, 635 F.3d at 1186, when Bisker asked for permission to search Heard, no reasonable person would have felt free to refuse once Dilworth began giving Heard orders. Dilworth's orders to Heard to keep his hands at his side or to raise his hands were not requests but rather commands that clearly "convey[ed] a message that compliance . . . [was] required." *Bostick*, 501

---

[11] The record contains no evidence suggesting that Bisker's request was not a genuine request but was instead a command clothed as a request.

17

U.S. at 435.   Thus, we analyze whether the officers had reasonable suspicion at this moment in time, not the moment when the district court assumed the stop began.  To do so, however, we must examine the circumstances leading up to the stop, including what occurred before Bisker asked Heard for consent to search him.

### 3. Reasonable Suspicion

In concluding that the officers had reasonable suspicion for the stop and the search, the district court considered many of the circumstances of Heard's encounter with Bisker and Dilworth.  But the court failed to consider the "totality of the circumstances—the whole picture" that the officers observed when they encountered Heard—including those facts objectively indicating that Heard had no involvement in the gunshots. *Cortez*, 449 U.S. at 417.  When we view the totality of the circumstances of the encounter, we conclude that reasonable suspicion was lacking at the time Dilworth began giving Heard orders.  And, because the stop was unlawful at its inception, we need not address the scope of the search.

The district court failed to consider the fact that when the officers encountered Heard, he was walking his small dog in the grass in front of an apartment building inside a gated apartment complex.[12]  The court also failed to consider the fact that Heard behaved like a cooperative witness:  he did not flee or

---

[12] Dilworth testified that the area in which Heard was standing was remote by comparison to the rest of the apartment complex, but Heard was in front of the apartment building where he indicated his mother lived.

18

try to avoid Bisker, but instead willingly told Bisker that he had heard gunshots and pointed in the direction where the shots originated; he provided Bisker with identification when asked; he explained what he was doing there, walking his dog; and he told Bisker that his mother lived in the complex, pointing toward her building, the one closest to where he was standing. When these facts are added to the circumstances the district court considered, the picture looks very different.[13]

We begin our review of the totality of circumstances with the facts that Bisker encountered Heard in a high crime area, at night, near where gunshots had been reported. Although undoubtedly "relevant contextual considerations" for our analysis, *Wardlow*, 528 U.S. at 124, these facts only very generally linked Heard to

---

[13] The district court erred in considering two facts as contributing to reasonable suspicion that must be excluded from the totality of the circumstances we consider here.

First, based on the evidence elicited at the hearings, the district court erred in concluding that the car with a smashed windshield was probative of reasonable suspicion. The district court did not find, nor did any of the witnesses testify, that the car's windshield appeared to have been recently broken, that there was reason to believe the broken windshield was related to the gunshots heard that evening, or that Heard had anything whatsoever to do with the car. Indeed, Dilworth testified that the car was an area of concern that he noted and intended to address separately from the encounter with Heard. The government also conceded at oral argument that the officers observed no connection between the car and Heard. Thus, the car provided no additional support for a finding of reasonable suspicion.

Second, we cannot agree with the district court that the officers' lack of a description of a suspect contributed to reasonable suspicion. The former Fifth Circuit, applying the "specific and articulable facts" standard from *Terry*, held that an officer may not stop an individual "on the basis of an incomplete and stale description of a suspect that could, plainly, have fit many people." *United States v. Jones*, 619 F.2d 494, 498 (5th Cir. 1980). Here, the officers acted with *no* description of a suspect, so any person who happened to be at the scene could be implicated. If, under *Jones*, an incomplete and stale description is inadequate, then the lack of a description of a suspect cannot be a "specific and articulable fact" that may contribute to a finding of reasonable suspicion.

19

the gunshots:  he was the only person present around the time and near the place where the shots were heard.  The temporal link is a weak one because Bisker encountered Heard approximately a quarter to half an hour after the shots reportedly were fired, rather than mere minutes.  And the fact that Heard was found inside a gated apartment complex, walking his small dog in front of the building where his mother lived, ran counter to any reasonable suspicion that Heard was not supposed to be in that area or was there to engage in criminal activity.  All told, these circumstances in no way "operate[d] to distinguish" Heard in any way that gave rise to objective, particularized suspicion toward him. *Ballard*, 573 F.2d at 916.

The other facts the district court considered, although particular to Heard—signs of nervousness and an apparent refusal to cooperate—are insufficient to tip the balance to reasonable suspicion.  Bisker testified that Heard became "a little defensive" when asked where his mother lived, although the conversation remained "amicable" by all accounts, and the officers described Heard as swaying, rigid, or tense.  But we have been "most reluctant to hold that the police can stop anyone" based simply on his exhibiting nervousness.  *Id.*; *see Perkins*, 348 F.3d at 971 ("In this circuit, we have required more than the innocuous characteristics of nervousness, a habit of repeating questions, and an out-of-state license for giving rise to reasonable suspicion.").  Bisker also testified that Heard failed to provide

20

his mother's apartment number when asked directly for it,[14] and Dilworth testified that after Bisker asked for permission to search Heard, Heard said he had done nothing wrong. Dilworth testified that Heard's words and tone of voice indicated that he "was opposed to answering any more questions." Doc. 69 at 79. His hands indicated that he "d[id]n't agree with this." *Id.* at 81. By the officers' own testimony, Heard's statements and mannerisms conveyed only that he did not wish to cooperate. We must credit the officers' "common sense conclusions about [Heard's] behavior." *Cortez*, 449 U.S. at 418. Yet "[w]e have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Bostick*, 501 U.S. at 437; *see Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (plurality opinion) ("The person approached . . . need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so, and his refusal to

---

[14] The district court considered the fact that Heard pointed at his mother's building rather than giving an apartment number to be probative of reasonable suspicion. The record established that after obtaining Heard's identification and determining that Heard's identification did not list an address in the apartment building, Bisker asked where Heard lived. Heard responded by pointing at the building closest to him and telling Bisker that his mother lived there. Although we allow officers to draw inferences based on their training and experience, *see United States v. Lindsey*, 482 F.3d 1285, 1290-91 (11th Cir. 2007), it is difficult to see how responding to that question by pointing to a particular building rather than by giving an apartment number properly contributed to the officers' reasonable suspicion. Considering Bisker's testimony that he then asked Heard for an apartment number and Heard did not provide one, however, our disagreement with the district court's conclusion drawn from these facts makes no meaningful difference in the reasonable suspicion analysis.

21

listen or answer does not, without more, furnish those grounds." (citation omitted)).

Contrary to the government's suggestion, this case is readily distinguishable from *Illinois v. Wardlow*. There, officers patrolling "an area known for heavy narcotics trafficking" for drug related activity observed someone standing next to a building holding an opaque bag. 528 U.S. at 121-22. The individual "looked in the direction of the officers and fled." *Id.* at 122. The officers gave chase and then conducted a *Terry* stop, recovering a firearm from the bag. *Id.* The Supreme Court held that the officers had reasonable suspicion for the stop and search, emphasizing the weight in the reasonable suspicion analysis of the individual's "unprovoked flight upon noticing the police": "Headlong flight—wherever it occurs—is the consummate act of evasion" that is "certainly suggestive" of wrongdoing. *Id.* at 124. The Court rejected the argument that flight was akin to a refusal to cooperate by "going about one's business." *Id.* at 125.

Here, though, Heard did not flee. He was cooperative with the officers until he was asked for consent to search his person, then he protested his innocence of any wrongdoing and indicated with gestures that he did not wish to consent. To hold under these circumstances that Heard's conduct supplied reasonable suspicion would be to unreasonably narrow the ways in which an individual can indicate his refusal to cooperate during a consensual encounter with police. Neither Supreme

22

Court caselaw nor our circuit precedent supports such a narrowing.  Indeed, to give proper effect to *Bostick* and *Royer*, we must allow individuals some meaningful opportunity to voice their objections through words and gestures.

Factors like known criminal activity in an area; time of day; proximity, both temporal and geographic, to reported suspicious activity; unusual nervousness; and refusal to cooperate can certainly contribute to reasonable suspicion.  Here, though, the district court failed to consider factors that objectively cut against suspicion of criminal activity; namely, that Heard was walking his small dog in a grassy area in front of an apartment building inside a gated complex and, when approached by a uniformed police officer, remained calm, provided identification, and willingly answered questions about the gunshots, his residence, and his reason for being there.  These facts—which objectively indicated that Heard was uninvolved in the reported gunshots—considered alongside the other relevant facts, preclude a finding of reasonable suspicion in this case.  Thus, the stop was unlawful at its inception.[15]

---

[15] The government asks us to consider Bisker's testimony that after Dilworth ordered Heard to lower and/or raise his hands, Heard suspiciously raised and lowered his hands several times.  But by that point, the *Terry* stop had already begun.  Even assuming Heard's conduct was suspicious—rather than simply an attempt to deal with apparently conflicting commands—any suspicious actions by Heard after the moment he was stopped are immaterial to the question of whether the stop was justified at its inception.  *See Lewis*, 674 F.3d at 1305 ("[I]t is by now well-settled law that the reasonable suspicion inquiry focuses on the information available to the officers at the time of the stop . . . not information that the officers might later discover.").  Allowing officers to move the stop's inception, and thus the reasonable suspicion inquiry, to the point when they observed something suspicious or discovered something criminal, would

23

Because we conclude that articulable reasonable suspicion did not exist at the inception of the *Terry* stop, the stop violated the Fourth Amendment, and we need not analyze whether the scope of the stop or search was reasonable. *See United States v. Griffin*, 696 F.3d 1354, 1358 (11th Cir. 2012). The gun seized from Heard must therefore be suppressed, *see Perkins*, 348 F.3d at 969, and because possessing a gun was a necessary element of Heard's crime of conviction, we must vacate his conviction.

### III. CONCLUSION

For the foregoing reasons, we vacate Heard's conviction and remand for further proceedings consistent with this opinion.

**VACATED and REMANDED.**

---

eviscerate *Terry* and the exclusionary rule. *See Perkins*, 348 F.3d at 969-71 (applying the exclusionary rule). In any event, Dilworth—who conducted the pat down—never testified that Heard raised and lowered his hands. Instead, Dilworth testified that based on his "instinct" he believed Heard to be armed. Such an "inarticulate hunch[]" clearly is insufficient justification for a search. *Terry*, 392 U.S. at 22.

24